UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 18 - 10017 GAO (DHH) |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| JOHN H. NARDOZZI, | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Defraud the United States |
| | ) | (Count One) |
| Defendant. | ) | |
| | ) | 26 U.S.C. § 7206(2) |
| | ) | Aiding and Assisting in Filing False Tax Returns |
| | ) | (Counts Two – Nine) |

**INDICTMENT**

The Grand Jury charges that:

**General Allegations**

At all times relevant to this Indictment:

1.      John H. Nardozzi ("Nardozzi"), a resident of Milton, Massachusetts, was a Certified Public Accountant ("CPA"). Defendant Nardozzi received his CPA license in or about March 1977. In or about January 2008, after working for a tax, audit, and accounting firm located in Massachusetts for approximately twenty-seven years, defendant Nardozzi became the sole member and manager of JOHN H. NARDOZZI, LLC, a company located in Massachusetts. According to state records, the purpose of JOHN H. NARDOZZI, LLC, was "[t]o engage in certified public accountancy [and to] perform business and accounting services," among other things.

2.      Brian Augustine Joyce ("Joyce"), a resident of Milton, Massachusetts, served as the State Senator for the Norfolk, Bristol, and Plymouth district, from approximately 1998 to 2017. Joyce also was a licensed attorney who maintained a law office in Canton, known as the Joyce Law Group (the "Joyce Law Office"). In or about January 2006, Joyce incorporated BRIAN A. JOYCE, ATTORNEY AT LAW, P.C. ("BAJPC"), in Massachusetts. The BAJPC was a named partner in other

law practices that operated as limited liability companies under the umbrella of the Joyce Law Office. The BAJPC also had an ownership interest in a shell company called Windswept, LLC ("Windswept"), which Joyce created with Nardozzi's assistance in 2011 to collect alleged commissions from an energy broker company.

3.      The BAJPC was a personal service corporation (hereinafter "PSC"). As such, the BAJPC itself was subject to taxation on income generated annually by the corporation. Joyce, the sole shareholder, officer, and director of the BAJPC, was also independently subject to taxation on any income and distributions Joyce received from the corporation.

4.      For tax years 2011 through 2014, and in previous tax years, defendant Nardozzi prepared and filed Internal Revenue Service ("IRS") Form 1120 ("U.S. Corporation Income Tax Return") for the BAJPC. During that time, defendant Nardozzi also prepared and filed IRS Form 1065 ("U.S. Return of Partnership Income") for the law practices within the Joyce Law Office as well as Windswept. Joyce electronically signed the BAJPC corporate returns and partnership returns for tax years 2011 through and including 2014 under the pains and penalties of perjury. Defendant Nardozzi electronically signed as the tax preparer on all the corporate and partnership tax returns.

5.      For tax years 2011 through 2014, and in previous tax years, defendant Nardozzi prepared and filed IRS Form 1040 joint federal income tax returns for Joyce and Joyce's spouse. Joyce and his spouse electronically signed their personal tax returns for tax years 2011 through and including 2014 under the pains and penalties of perjury. Defendant Nardozzi electronically signed as their tax preparer on all the Form 1040 tax returns.

6.      Under the Internal Revenue Code, Joyce was an employee of his corporation, the BAJPC, for tax-reporting purposes. As such, defendant Nardozzi and Joyce were required to report the compensation Joyce received from the BAJPC for work performed or services rendered as wage

2

income on Joyce's IRS Form 1040.  For tax years 2011 through and including 2014, defendant

Nardozzi and Joyce reported wage income totaling $113,000 for Joyce from the BAJPC on Joyce's

personal tax returns.  Salary and wages are properly deducted as corporate payroll expenses and,

therefore, operate to reduce a PSC's taxable income.

7.      In addition to reporting any wages Joyce actually earned as an employee of the BAJPC,

defendant Nardozzi and Joyce were also required to report distributions of profit to Joyce from the

BAJPC as dividends on Joyce's IRS Form 1040.  Joyce's IRS Forms 1040 show that defendant

Nardozzi and Joyce reported dividends from the BAJPC to Joyce in the amounts of $200,000 in

2012 and $50,000 in 2013.  Defendant Nardozzi and Joyce reported no dividends from the BAJPC

on Joyce's personal tax returns for tax years 2011 and 2014, but the BAJPC's corporate tax return

for tax year 2014 reflects the issuance of a $100,000 dividend.  Joyce was the corporation's sole

shareholder and, therefore, the only person entitled to a dividend from the BAJPC in 2014.  By

omitting the $100,000 dividend from Joyce's personal tax return, defendant Nardozzi enabled

Joyce to avoid paying at least $15,000 in federal income tax.  Joyce took dividends in 2012, 2013,

and 2014 to pay down a $400,000 loan to him from the BAJPC.  Dividends, unlike payroll

expenses, are not deductible business expenses and therefore do not operate to lower a PSC's

taxable income.

8.      From at least in or about January 2011 through in or about December 2015, Joyce regularly

utilized the corporate bank account of the BAJPC to pay his and his family's personal expenses,

such as college and high school tuitions, credit card bills, life insurance policy premiums, personal

lines of credit, home improvements, and federal and state taxes.  During this same period, Joyce

also received cash distributions directly from the BAJPC's corporate bank account.  None of these

payments or distributions were classified as dividends.  Instead, defendant Nardozzi and Joyce

3

falsely reported and deducted as corporate expenses these distributions when that money was really a distribution of profits and not legitimate business expenses of the BAJPC.

9.      From at least in or about January 2011 through in or about December 2015, Joyce instructed the BAJPC's bookkeepers ("BK 1" and "BK 2") to issue checks from the BAJPC business account to pay his and his family's expenses and to receive money himself whenever sufficient funds were available in the account.  If the BAJPC bank account lacked sufficient funds, Joyce caused the transfer of funds from a law-partnership bank account to the BAJPC bank account to cover his expenses, which were substantial because of Joyce's spending habits and resulted in cash flow and liquidity issues for the BAJPC.

10.     From at least in or about January 2011 through in or about December 2015, defendant Nardozzi and Joyce caused BK 1 and BK 2 to classify the payments of Joyce's personal expenses and distributions to Joyce as corporate expenses in BAJPC's general ledgers and QuickBooks records and to record these payments as legitimate expenses of the corporation in BAJPC's Profit and Loss Statements.  After reviewing these accounting records and consulting with Joyce and BAJPC's bookkeepers, defendant Nardozzi included BAJPC's payment of Joyce's personal expenses and cash disbursements to Joyce as legitimate corporate expenses in order to reduce the BAJPC's taxable income in tax years 2011 through 2014.

11.     For tax years 2011 through and including 2014, defendant Nardozzi and Joyce knowingly and willfully reduced the amount of federal income taxes the BAJPC owed by deliberately misclassifying a total of approximately $2,268,520 of Joyce's expenses and cash distributions to Joyce as legitimate deductible corporate expenses of the BAJPC on IRS Forms 1120.

12.     For tax years 2011 through and including 2014, the amount of federal income tax due from and payable by the BAJPC, including the misclassified $2,268,520, would have been approximately $850,748.

13.     For tax years 2011 through and including 2014, defendant Nardozzi and Joyce caused the BAJPC to pay a total of approximately $56,766 in federal income taxes.

14.     For tax years 2011 through and including 2014, defendant Nardozzi and Joyce knowingly and willfully caused the BAJPC to avoid paying approximately $793,982 in federal corporate income taxes.

15.     Joyce's spouse was a self-employed residential real estate broker.  For tax years 2011 through and including 2014, Joyce's spouse did not receive an IRS Form 1099-MISC from the BAJPC reflecting compensation for work performed as a self-employed individual for the corporation nor did she receive an IRS Form W-2 showing that she had received a salary from the BAJPC.  Joyce's Statement of Financial Interest, which Joyce was required to file annually as a State Senator with the Massachusetts State Ethics Commission, also did not publicly identify his spouse as a full or part-time employee of the BAJPC for the years 2011 through and including 2014.  During that four-year period, however, defendant Nardozzi and Joyce fraudulently inflated the self-employment income of Joyce's spouse by allocating approximately $390,000 in BAJPC distributions to her and reporting that money as income attributable to Joyce's spouse's real estate business on Schedule C of IRS Form 1040.

16.     Schedule C of IRS Form 1040 ("Profit or Loss from Business – Sole Proprietorship") is used to report self-employment business income.  Wages earned as a corporate employee and dividends received from a corporation such as the BAJPC are not reported on Schedule C.  In tax years 2011 through 2014, defendant Nardozzi and Joyce fraudulently reported more than $2.2

5

million in self-employed business income for Joyce and Joyce's spouse from the BAJPC on each of their respective Schedule Cs despite Joyce being an employee of the BAJPC and Joyce's spouse not working for the business.

17.     Reporting wages actually earned as self-employed business income on Schedule C allows a self-employed taxpayer to contribute to a Simplified Employee Pension Individual Retirement Arrangement ("SEP-IRA") and deduct a percentage of those contributions from taxable income on his or her IRS Form 1040. SEP-IRA deductions for self-employed taxpayers are limited to a percentage of the taxpayer's earned income as reported on Schedule C. There is a cap on the maximum deduction a taxpayer may claim each year. The amount a self-employed individual can contribute to a SEP-IRA and claim as a tax deduction is significantly higher than the amount that can be contributed to a traditional IRA with a resulting reduction in taxable income. By classifying corporate distributions of profit to Joyce as self-employment income on Joyce's Schedule C and inflating the self-employment income reported on Joyce's spouse's Schedule C each year, defendant Nardozzi and Joyce deducted approximately $268,257 more than Joyce and his spouse were entitled to deduct from the Joyce's taxable income in tax years 2011 through and including 2014.

18.     Between August 2014 and December 2014, Joyce purchased and caused his spouse to purchase approximately $471,250 worth of privately held common stock in a Delaware holding company (the "EIB Company"), an insurance brokerage company that specialized in providing insurance products for energy companies. Joyce and his spouse purchased this common stock ("EIB Common Stock") with approximately $76,125 drawn from a home equity line of credit and approximately $395,125 obtained through a series of early withdrawals from his and his spouse's SEP-IRAs. Defendant Nardozzi and Joyce nevertheless claimed on Joyce's 2014 IRS Form 1040

that the purchase of EIB Common Stock was a tax-free rollover of $427,629, when, in fact, it was a taxable event subject to early withdrawal penalties. Defendant Nardozzi and Joyce also falsely claimed on Joyce's 2014 personal tax return a SEP-IRA deductible contribution of $80,502, of which $76,125 consisted of Joyce's purchase of common stock with funds from a home equity line of credit.

19.     To qualify as a non-taxable IRA rollover, IRA assets must be transferred from one qualified IRA custodian ("IRA custodian") to another qualified IRA custodian within a 60-day period. In tax year 2014, Joyce did not execute a tax-exempt "rollover" of $427,629 in EIB Common Stock from IRA custodian-to-IRA custodian. Instead, Joyce purchased EIB Common Stock with funds drawn from a home equity line of credit in August 2014 and the liquidation of his and his spouse's SEP-IRAs through a series of early withdrawals of retirement funds between October and December 2014. Records pertaining to the Joyce's retirement accounts do not reflect the acquisition, transfer, or rollover of EIB Common stock into the Joyce's SEP-IRAs. Joyce's financial advisor ("Financial Advisor"), who served as broker of record for Joyce's and Joyce's spouse's SEP-IRAs since 2007, could only confirm that withdrawals were made from the Joyce's retirement accounts between October and December 2014.

20.     Withdrawals from an IRA are taxed as income and, if executed prior to the age of 59 and 1/2, are subject to an early withdrawal penalty fee with few exceptions. At the time of their SEP-IRA withdrawals in 2014, Joyce and his spouse were under the age of 59 and 1/2 and did not qualify for other exceptions. By reporting the early withdrawal of funds from the Joyce's retirement accounts as a tax-exempt rollover on Joyce's 2014 personal tax return and claiming that the tax return was otherwise accurate, defendant Nardozzi and Joyce caused Joyce and Joyce's

spouse to avoid paying approximately $208,100 in additional income taxes and early withdrawal penalty fees.

21.    From in or about March through April 2015, defendant Nardozzi informed Joyce that due to defendant Nardozzi's concern that the BAJPC's taxes were higher than anticipated, defendant Nardozzi would deduct a corporate dividend of $56,209 as a legal expense of the corporation in order to falsely reduce the BAJPC's taxable income.

**Statutory Allegations**

<u>**COUNT ONE**</u>
**(18 U.S.C. § 371 – Conspiracy to Defraud the United States)**

22.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 21 of this Indictment as if fully set forth herein, and further alleges that:

23.    From a date unknown but no later than in or about January 2011, and continuing until at least in or about December 2015, within the District of Massachusetts, the defendant,

**JOHN H. NARDOZZI,**

and other persons and entities known and unknown to the Grand Jury, including Brian Augustine Joyce, did knowingly and willfully combine, conspire, confederate, and agree together to defraud the United States of America and an agency thereof, to wit, the Internal Revenue Service of the United States Treasury Department, by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of the revenue, to wit, federal income taxes.

I.    **Objective of the Conspiracy**

24.    A purpose and objective of the conspiracy was that defendant John H. Nardozzi and other persons and entities known and unknown to the Grand Jury, including Brian Augustine Joyce, knowingly and willfully would and did subvert the function of the IRS to ascertain, compute, assess, and collect income taxes due and owing from BRIAN A. JOYCE, ATTORNEY AT LAW, P.C. ("BAJPC"), Joyce, and Joyce's spouse, by fraudulently (i) deducting as business expenses to the BAJPC, millions of dollars of personal expenses for Joyce and Joyce's family; (ii) inflating Joyce's and Joyce's spouse's self-employment income in order to maximize retirement plan contributions and falsely reduce taxable personal income; (iii) reporting a rollover of $427,629 in retirement savings when, in fact, it was a taxable event subject to early withdrawal penalties; (iv) deducting

a corporate dividend as a legal expense to falsely reduce the taxable income of the BAJPC; and

(v) omitting a dividend from Joyce's personal tax return to reduce Joyce's taxable income.

II.    **Manner and Means of the Conspiracy**

25.    Among the manner and means employed by defendant Nardozzi and others to carry out the

conspiracy and to effect its unlawful object were the following:

A.  Defendant Nardozzi and others fraudulently classified approximately $2.2 million in cash

distributions to Joyce and expenses paid on his behalf and for the benefit of his family

members as legitimate business expenses of a corporation, the BAJPC, in order to reduce

the taxable income of the BAJPC.

B.  Defendant Nardozzi and others fraudulently inflated (i) Joyce's spouse's yearly income by

falsely allocating hundreds of thousands of dollars of BAJPC income to Joyce's spouse,

and (ii) Joyce's yearly self-employment income, all in order to fraudulently maximize the

retirement fund contributions of Joyce and his spouse and to reduce the Joyce's taxable

personal income.

C.  Defendant Nardozzi and others fraudulently reported a tax-exempt IRA rollover of

$427,629 on the Joyce's 2014 IRS Form 1040 when, in fact, Joyce used funds (i) drawn

from a home equity line of credit, and (ii) obtained through the liquidation of his and his

spouse's SEP-IRAs through a series of early withdrawals of retirement funds, to purchase

more than $470,000 worth of EIB Common Stock.

D.  Defendant Nardozzi and others falsely (i) classified a dividend of approximately $56,209

to Joyce as an expense to the BAJPC in order to reduce the BAJPC's taxable income, and

(ii) omitted a dividend of approximately $100,000 from Joyce's personal tax return in order

to reduce Joyce's taxable income.

### III.   Overt Acts

In furtherance of the conspiracy and to accomplish its objectives, defendant Nardozzi and

his coconspirators, including Joyce, committed the following overt acts, among others, in the

District of Massachusetts:

**The Deliberate Misclassification of Payments of Joyce's Personal Expenses and Cash
Disbursements Directly to Joyce as Legitimate Corporate Expenses.**

26.   OVERT ACT 1: On or about January 16, 2012, defendant Nardozzi and Joyce caused BK
1 to send defendant Nardozzi an email along with several attachments, including the BAJPC's
2011 Profit & Loss ("P&L") Statement.  The P&L Statement for calendar year 2011 reflected,
among other things, the following entry: "Professional Fees ... Legal Fees (BAJ) [$]343,379.62."
The BAJPC transaction detail records pertaining to that entry in the 2011 P&L Statement included,
but were not limited to, payments to colleges, credit card services, custodians of SEP-IRAs, and
to Joyce himself, all of which totaled $343,379.62.

27.   OVERT ACT 2: On or about January 23, 2013, defendant Nardozzi and Joyce caused BK
1 to send defendant Nardozzi an email containing the subject line "The Brian A. Joyce Empire"
along with several attachments, including a comparison of BAJPC's 2011 and 2012 P&L
Statements.   The P&L Statement for calendar year 2012 reflected, among other things, the
following entry: "Professional Fees ... Legal Fees (BAJ) [$]680,313.25."

28.   OVERT ACT 3: On or about January 29, 2013, defendant Nardozzi and Joyce caused BK
1 to send defendant Nardozzi an email containing the subject line "FW: Report from Brian A.
Joyce, Attorney at Law, PC".   Attached to the email was a transaction detail record listing the
individual expenses attributed to "Professional Fees, Legal Fees (BAJ)" for 2012.  Those "Legal
Fees" included, but were not limited to, payments to colleges, a private high school, a clothing
store, a vacation in Aruba, the IRS, credit card services, housecleaning (Milton), individuals
performing work on Joyce's residential basement, the Massachusetts Department of Revenue
(personal taxes), and to Joyce himself, all of which totaled $680,313.25.

29.   OVERT ACT 4: On or about February 7, 2014, defendant Nardozzi and Joyce caused BK
2 to send defendant Nardozzi an email containing the subject line "2013 tax info" along with
transaction detail reports for the BAJPC.  The BAJPC transaction detail records for 2013 listed
individual expenses attributed to "Professional Fees, Legal Fees (BAJ)," including, but not limited
to, payments to a private high school, the IRS, credit card services, custodians of the Joyce's SEP-
IRAs, the Town of Milton (residential property tax), individuals performing work on Joyce's
basement, the Massachusetts Department of Revenue (personal taxes), life and homeowners
insurance policy holders, and to Joyce himself (classified as "distribution[s]"), all of which totaled
$816,355.33. BAJPC's P&L Statement for calendar year 2013 reflected, among other things, the
following entry: "Professional Fees ... Legal Fees (BAJ) [$]816,355.33."

30.    OVERT ACT 5: On or about March 13, 2014, defendant Nardozzi sent BK 2 an email with attachments that contained, among other things, an adjusting entry to the BAJPC's 2013 P&L Statement increasing the "Legal Fees (BAJ)" by $25,000 for the payment of a personal expense for Joyce, bringing the total for the "Legal Fees (BAJ)" for calendar year 2013 to $841,355.33.

31.    OVERT ACT 6: On or about March 2, 2015, defendant Nardozzi caused BK 2 to send defendant Nardozzi an email containing the subject line "BAJ PC" along with several attachments, including a comparison of BAJPC's 2013 and 2014 P&L Statements. The P&L Statement for calendar year 2014 reflected, among other things, the following entry: "Professional Fees ... Legal Fees (BAJ) [$]347,263.09." The BAJPC transaction detail records listing the individual expenses attributed to "Professional Fees, Legal Fees (BAJ)" for 2014 included, but were not limited to, payments to a college, a private high school, credit card services, a personal line of credit, an individual performing home basement repairs, student loans, and to Joyce himself (classified as "distribution[s]"), all of which totaled $347,263.09.

### The Fraudulent Allocation of Joyce's Distributions
### From the BAJPC to Joyce's Spouse.

32.    OVERT ACT 7: On or about October 4, 2011, Joyce caused an email to be sent by BK 1 to defendant Nardozzi and Joyce stating in part, "Brian would like you to evaluate his personal tax situation in the event he is able to make a 'catch up' payment prior to year end ... He has received in Fees, including personal expenses paid on his behalf through 10/4/11: 280,600.00 ... I discussed the cash situation with both you and BAJ, and he determined that paying SEP IRA was the priority ...."

33.    OVERT ACT 8: On or about January 17, 2012, defendant Nardozzi caused an email to be sent to him by BK 1 describing the breakdown of how a check for $415,000, made payable to BAJPC, was spent. BK 1 replied in part, "It was also Brian's intention to pay [Joyce's spouse's] SEP IRA payment from this check, but I do not know how much that will be. I believe you [defendant Nardozzi] have to give me that number when you see what her income is."

34.    OVERT ACT 9: On or about April 5, 2012, defendant Nardozzi sent Joyce an email stating, "Brian, last year [tax year 2010] we didn't move any income from you to [Joyce's spouse]. I'm not sure why that decision was finally made. As of this writing I only moved $40K over to [Joyce's spouse]. Any thoughts on what you want to do?"

35.    OVERT ACT 10: Later on April 5, 2012, Joyce responded to defendant Nardozzi's inquiry via email, "I would move as much as necessary so as to allow us to max out on her SEP IRA if I hit the lottery between now and October."

36.    OVERT ACT 11: On or about April 9, 2012, Joyce forwarded the email chain to BK 1 and defendant Nardozzi asking, "how much are you comfortable saying that we will be able to pay toward [Joyce's spouse's] 2011 SEP IRA by October 15, 2012?"

37.    OVERT ACT 12: On or about April 10, 2012, defendant Nardozzi sent BK 1 and Joyce an email with the subject line "[Joyce's spouse's] income," stating, "I have prepared the extension

with $60,000 going to [Joyce's spouse's] Schedule c business. Based on that her contribution to her SEP-IRA would be $17,298."

38.    OVERT ACT 13: On or about February 11, 2013, Joyce sent defendant Nardozzi an email copying BK 1 and Joyce's Financial Advisor, asking "[BK 1] and John [defendant Nardozzi], Can you please reach an agreement for the maximum SEP IRA payments for [Joyce's spouse] and me for 2012? Could you do the same for 2013?"

39.    OVERT ACT 14: On or about February 12, 2013, defendant Nardozzi responded in an email to Joyce, Joyce's Financial Advisor, and BK 1, "We agreed on $20,000 for [Joyce's spouse] for both years."

40.    OVERT ACT 15: On or about April 10, 2014, defendant Nardozzi sent Joyce an email stating, "I allocated $130K to [Joyce's spouse]. That allows you to put another $31K in her SEP if you want...."

41.    OVERT ACT 16: On or about August 20, 2014, Joyce sent defendant Nardozzi an email stating, "52K for me (sic) SEP IRA limit this year. How much can I allocate for [Joyce's spouse]? Everything look ok with my financials?"

42.    OVERT ACT 17: On or about August 21, 2014, defendant Nardozzi responded to Joyce's inquiry via email, "Yes. I know you want to maximize the SEP. The amount I used was based on the income on the projection (20%), for both you and [Joyce's spouse]."

### The Expensing of a $56,209 Dividend to Reduce the BAJPC's Taxable Income.

43.    OVERT ACT 18: On or about March 26, 2013, defendant Nardozzi sent Joyce and BK 1 an email stating, "I've been thinking of how to reduce/eliminate the loan on the books that is due from Brian ($400k). This loan was created several years ago, to meet Brian's needs at the time, interest at the minimum federal rate has been charged annually. That interest is not deductible. I think the best way to reduce or eliminate this loan is for the corporation to declare an annual dividend over the next several years until it is gone ... This plan is better than giving the money to Brian as regular income and then repaying the loan."

44.    OVERT ACT 19: Later on March 26, 2013, Joyce responded to defendant Nardozzi and BK 1 in an email agreeing with defendant Nardozzi's proposal.

45.    OVERT ACT 20: On or about April 2, 2013, defendant Nardozzi instructed BK 1 in an email to post a dividend to Joyce to retained earnings rather than expense it "so that there is no issue." Defendant Nardozzi also stated in the email, "I would also like Brian to have corporate minutes declaring the dividend."

46.    OVERT ACT 21: Later on April 2, 2013, defendant Nardozzi again emailed BK 1, copying Joyce, stating, "[s]o, we have $100,000 [dividend] for 2012 and $100,000 [dividend] for 2013. **We should check with Brian first**. The corporate minutes are important." (emphasis original).

47.     OVERT ACT 22: On or about April 9, 2013, defendant Nardozzi and Joyce caused BK 1 to email to them corporate minutes signed by Joyce and backdated to December 17, 2012, declaring a $200,000 dividend to Joyce for 2012 and a $50,000 dividend to Joyce for 2013 through and including 2016.

48.     OVERT ACT 23: On or about March 3, 2015, defendant Nardozzi sent BK 2 an email asking about a note receivable for $56,208 (later, rounded-up to $56,209).  Later that date, BK 2 informed defendant Nardozzi via email that the entry related to a corporate dividend that was applied annually to pay down an officer loan (the $400,000 loan to Joyce described above).

49.     OVERT ACT 24: On or about March 9, 2015, at the direction of defendant Nardozzi, BK 2 emailed to defendant Nardozzi a final Balance Sheet and Profit and Loss Statement for tax year 2014, that included the $56,209 as an expense of the BAJPC, resulting in a total of $403,471.71 in "Legal Fees (BAJ)".

50.     OVERT ACT 25: On or about March 13, 2015, defendant Nardozzi sent Joyce an email stating in part, "I'm noticing two items of income that will affect the tax projections we did earlier. Instead of a dividend from BAJPC, I treated it as legal fees to you.  I did this to reduce BAJPC taxable income and avoid a double tax ..."

51.     OVERT ACT 26: On or about April 6, 2015, defendant Nardozzi sent Joyce an email stating in part, "I'm concerned about your taxes. The income from BAJPC is higher than I knew about, mainly because some expenses like tuition Where [sic] paid under a line item that was not Legal Fees BAJ.  I also expensed as legal fees to you the balance of the [sic] Due from BAJ of about $50,000 to avoid the double tax.  I'd like to get a handle on this sooner than later, so you are prepared."

### The False Reporting of a Tax-Exempt IRA Rollover.

52.     OVERT ACTS 27 THROUGH 31:  From August to December 2014, Joyce orchestrated the purchase of EIB Common Stock through the use of a home equity line of credit and the liquidation of his and his spouse's SEP-IRA funds, which were held by qualified IRA custodians, as follows:

| Overt Act | Check Date | SEP-IRA Liquidation (or Line of Credit Withdrawal indicated with *) | EIB Common Stock Purchase Date | JOYCE Personal Check (or Line of Credit Check *) Issued to EIB Company | Memo on Check |
|---|---|---|---|---|---|
| 27 | 8/30/2014 | $50,750* | 9/5/2014 | $50,750* | 7,000 Shares SEP IRA |

14

| Overt Act | Check Date | SEP-IRA Liquidation (or Line of Credit Withdrawal indicated with *) | EIB Common Stock Purchase Date | JOYCE Personal Check (or Line of Credit Check *) Issued to EIB Company | Memo on Check |
|---|---|---|---|---|---|
| 28 | 8/30/2014 | $25,375* | 9/5/2014 | $25,375* | 3,500 Shares SEP IRA |
| 29 | 10/4/2014 | $105,125 (Spouse IRA) | 10/4/2014 | $105,125 | 14,500 Shares [Spouse] SEP IRA |
| 30 | 12/8/2014 | $72,500 (Spouse IRA) | 12/10/14 | $72,500 | 10,000 Shares [Spouse] SEP IRA |
| 31 | 12/8/2014 | $250,000 (Joyce IRA) | 12/10/14 | $217,500 | 30,000 Shares SEP IRA |
| | **Totals** | **$503,750 withdrawn** | | **$471,250 paid to EIB Company** | **65,000 shares of EIB Common Stock** |

53.     OVERT ACT 32: On or about March 13, 2015, after Joyce and his spouse purchased EIB Common Stock with home equity funds and early withdrawals from their SEP-IRAs, defendant Nardozzi sent Joyce an email stating, "I am noticing two items of income that will affect the tax projections we did earlier... There are twelve form 1099Rs [the form generated to report a withdrawal from an IRA] from [IRA custodian] Bank. Seems to be from 12 funds with same account number totaling $250K.  No withholdings and to be treated as an early withdrawal.  This will have a significant effect on your return."

54.     OVERT ACT 33: Later on March 13, 2015, Joyce responded to defendant Nardozzi in an email, "All IRA withdrawals were either reimbursed within 60 days, or invested in [EIB Company].  No taxes."

55.     OVERT ACT 34: On or about September 8, 2015, defendant Nardozzi filed with the Internal Revenue Service, a 2014 U.S. Individual Income Tax Return, Form 1040 for Joyce and Joyce's spouse, prepared by defendant Nardozzi, which return falsely reported a tax-exempt rollover of $427,629, and falsely reported a SEP-IRA deductible contribution of $80,502.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE
### (False Tax Return -- 26 U.S.C. § 7206(2))

56.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 – 21 and 24 – 55 of this Indictment as if set forth herein.

57.     The Grand Jury further charges that on or about the dates alleged below, in the District of Massachusetts,

### JOHN H. NARDOZZI

defendant herein, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax Returns, Forms 1040, for the following tax years, which Returns were false and fraudulent as to a material matter, as described above, as the defendant then and there knew:

| COUNT | FILING DATE | TAX YEAR | FRAUDULENT SCHEDULE C INCOME | FRAUDULENT ALLOCATIONS TO SPOUSE | FRAUDULENT ROLLOVER | FRAUDULENT OMISSION OF DIVIDEND |
|-------|-------------|----------|------------------------------|----------------------------------|---------------------|----------------------------------|
| 2 | 09/26/2012 | 2011 | $343,380 | $60,000 | --------------- | --------------- |
| 3 | 04/10/2013 | 2012 | $680,313 | $80,000 | --------------- | --------------- |
| 4 | 04/14/2014 | 2013 | $841,355 | $130,000 | --------------- | --------------- |
| 5 | 09/08/2015 | 2014 | $403,472 | $120,000 | $427,629 | $100,000 |

All in violation of Title 26, United States Code, Section 7206(2).

## COUNTS SIX THROUGH NINE
### (False Tax Return -- 26 U.S.C. § 7206(2))

58.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 – 21 and 24 – 55 of this Indictment as if set forth herein.

59.    The Grand Jury further charges that on or about the dates alleged below, in the District of Massachusetts,

### JOHN H. NARDOZZI

defendant herein, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Corporation Income Tax Returns, Forms 1120, for the following tax years, which Returns were false and fraudulent as to a material matter, as described above, as the defendant then and there knew:

| COUNT | FILING DATE | TAX YEAR | FRAUDULENT CORPORATE EXPENSES | FRAUDULENT DIVIDEND RECLASSIFICATION |
|---|---|---|---|---|
| 6 | 02/24/2012 | 2011 | $343,380 | ------------------ |
| 7 | 03/13/2013 | 2012 | $680,313 | ------------------ |
| 8 | 03/18/2014 | 2013 | $841,355 | ------------------ |
| 9 | 03/12/2015 | 2014 | $347,263 | $56,209 |

All in violation of Title 26, United States Code, Section 7206(2).

A TRUE BILL

_David Bower_
FOREPERSON OF THE GRAND JURY

_DUSTIN CHAO_
WILLIAM F. BLOOMER
ASSISTANT U.S. ATTORNEYS

U.S. DISTRICT OF MASSACHUSETTS; January 18, 2018.
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

4:13 p.m.
1-18-18

19