UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 18-10017-WGY |
| v. | ) | |
| | ) | |
| JOHN H. NARDOZZI, | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant U.S. Attorneys, requests that on January 9, 2020 the Court sentence defendant John H. Nardozzi (hereinafter, "defendant" or "Nardozzi") to a 41-month term of imprisonment, a sentence that is within the United States Sentencing Guidelines ("Guidelines") as calculated by the United States Probation Office, as well as restitution in the amount of $598,362.80, payable to the Internal Revenue Service.

I.     Advisory Sentencing Guidelines

The United States Probation Office ("Probation") position with respect to the Sentencing Guidelines, is set forth at pages 8-9 of the Final Pre-Sentence Report ("PSR"), and follows, in sum:

(i)     in accordance with USSG §§ 2T1.4 (a)(1) and 2T4.1(H), defendant's base offense level is 20, because the tax loss was in excess of $550,000, but less than $1,500,000; and

(ii)     in accordance with USSG §2T1.4(b)(1)(B), because the defendant was in the business of preparing tax returns, a two-level increase is warranted.

Accordingly, the total offense level is 22.  The defendant's criminal history category is I, which results in a GSR of 41 to 51 months' imprisonment.  PSR at ¶ 93.

The defendant objected to the draft PSR sentencing calculations in which Probation initially calculated his total offense level to be 32, with a GSR of 121-151 months. *See* Def. Obj. to Draft PSR, Dec. 21, 2019 ("Def. Obj."). Probation's final PSR has rendered most of the defendant's objections moot, but in his Def. Obj., the defendant still contests the loss amount. Nardozzi argues that because it is impossible to determine what theory of guilt the jury chose with respect to its guilty findings, the loss amount is overstated. *See* Def. Obj. at 6. The jury, however, already explicitly rejected this argument in its verdict when it returned its special finding, <u>beyond a reasonable doubt</u>, that the loss amount reasonably attributed to Nardozzi was in excess of $550,000. *See* Jury Verdict Sheet, ECF Dkt. No. 166.

II.     <u>Factual Background</u>

For the tax years 2011 to 2014, the defendant and his longtime client, Brian A. Joyce engaged in a conspiracy to defraud the United States' lawful collection of federal income tax. The object of the conspiracy was for Nardozzi and Joyce to defeat the lawful collection of federal income tax by employing several different fraudulent means. PSR ¶ 8.

The scheme had two overarching, but interrelated, elements. The first overarching element was to reduce (and in some cases, practically eliminate) all taxable income for Joyce's C-corporation. The second overarching element was to use the income from Joyce's C-corporation to inflate IRA contributions (and thus, fraudulently take retirement savings deductions against personal income) on Joyce's and his spouse's personal income tax returns. PSR ¶ 9.

<u>Brian A. Joyce</u>

Brian A. Joyce was a powerful Massachusetts state senator, who was a former Assistant Majority Leader of the Massachusetts State Senate and who had served nearly two decades as a

State Senator from Milton, MA. Joyce also had a law practice in Canton, MA, which dealt primarily with legal work pertaining to small insurance claims. In or about May 2015, the Boston Globe reported on extensive self-dealing that Senator Joyce had been conducting for years with various vendors that did business before the State Senate. Following a lengthy investigation, a federal grand jury charged Joyce with 113 felony counts, which included extortion, honest services fraud, money laundering, and tax fraud. In sum, the grand jury charged Joyce with selling his Senate seat to the highest bidder, rewarding companies that ostensibly hired Joyce's law office for "legal work" and, in return, received favorable legislative support from Joyce. PSR ¶ 10.

John H. Nardozzi

The defendant was not only Joyce's tax preparer, but was one of Joyce's closest business confidantes. Thousands of emails gathered from the investigation revealed that Joyce made few business decisions without first consulting with the defendant. To cite a few examples, Joyce called upon the defendant's counsel when Joyce sought to split his legal partnership; Joyce sought the defendant's advice when choosing a corporate form for new entities, including solar energy broker companies, and Joyce counted on defendant Nardozzi to introduce him to the business of energy brokerage sales, among other things. PSR ¶ 11.

In return, Nardozzi sought to benefit from Joyce's official position and contacts on matters large and small, business-related and personal, including: having Joyce use his official office to contact the MA Department of Insurance concerning defendant's personal disputes with various insurance companies, having Joyce represent the defendant's son in Dedham District Court to resolve a traffic violation, and seeking Joyce's business contacts to benefit the defendant's wife, among other things. PSR ¶ 12.

Brian A. Joyce, Attorney-at-Law, P.C. (the "C-Corp.")

To further his corruption scheme, Joyce used his law firm, the Brian A. Joyce, Attorney-at-Law, P.C. (the "C-Corp."), to conceal, and act as a buffer for, all of his illicit business interests. For example, Joyce used his senate position to pressure other public officials to hire a New York-based energy broker, Power Management Company, Inc. for their towns' energy needs. Power Management, in turn, then paid Joyce lucrative sales commissions. But instead of acknowledging his work as a commissioned sales agent for Power Management, Joyce used the C-Corp. to enter into the sales brokerage agreement with Power Management, and then masked all of his energy sales commissions as purported law firm income on his mandatory State Ethics Forms disclosures. PSR ¶ 13.

But the benefits of the C-Corp. came with a cost. While the C-Corp. gave Joyce cover and insulation for his illicit business interests, it also exposed Joyce to higher corporate tax rates than Joyce would have otherwise faced if Joyce did not use the C-Corp. for his nefarious purposes. Nardozzi was well aware of this consequence. It was undisputed that Nardozzi was cognizant of the severe tax disadvantages of a C-corporation (a flat tax rate of 35%, which was significantly higher than personal income tax rates, and subjecting owners to a "double tax," i.e., tax at the corporate level and tax at the personal income level). Indeed, if the defendant testified at trial, the government planned to introduce both a seminar and a journal article in which the defendant warned against the tax pitfalls of using a C-corporation to own a business because of the higher tax rate and double-tax exposure to the owner. PSR ¶ 14.

<u>The Scheme</u>

To solve the C-corporation tax issue, defendant Nardozzi and Joyce hatched a scheme whereby the defendant and Joyce treated the C-Corp. as a de facto pass-through entity to Joyce, whereby the C-Corp. income was funneled to pay Joyce's personal expenses, but at the same time, the defendant and Joyce treated those personal expenses (tuition payments, credit card bills, etc.) as corporate business expenses in order to reduce, and in some instances, eliminate the 35% corporate tax that applied to the C-Corp. income, thus avoiding the corporate double-tax. PSR ¶ 15.

As part of this two-pronged criminal manipulation of C-Corp. income, the defendant and Joyce sought to further illegally profit Joyce tax-wise by designating the funneled C-Corp. income as Schedule C income, or, in other words, as income that Joyce purportedly earned as a sole-proprietor. Joyce, of course, was not a sole proprietor, but rather was a corporate officer and a C-Corp. employee by virtue of wholly owning the C-Corp. Joyce was, thus, not entitled to report his "income" on Schedule C on his personal income tax return. But by reporting Joyce's income on Schedule C, the defendant fraudulently permitted Joyce to deduct tens of thousands of dollars from his federal personal income tax return in the form of SEP retirement contributions. These contributions would not have been permissible had the defendant properly reported Joyce's income as W-2 income. (During an interview with IRS Agents in February 2016, defendant Nardozzi admitted that he labeled Joyce's salary as Schedule C income to take advantage of SEP-IRA deductions.) PSR ¶ 16.

Further evidence of the defendant's and Joyce's criminal manipulation of C-Corp. income manifested itself when the defendant fraudulently diverted C-Corp. income to Joyce's spouse,

Mary Joyce, even though she performed no work for the C-Corp. Again, pursuant to the two-pronged scheme, this diversion of C-Corp. income to Mary helped Joyce avoid the corporate double tax on the C. Corp., and, at the same time, enabled Joyce to inflate SEP-IRA contributions, which would otherwise not be available to Mary. PSR ¶ 17.

The Charges Proved at Trial

First, for tax years 2011 to 2014, Nardozzi and Joyce underreported approximately $793,900, on Joyce's corporate tax returns by permitting Joyce to take more than $2.2 million from Joyce's C-Corp. bank account to pay for a variety of Joyce's personal expenses and to pay Joyce directly. Nardozzi and Joyce then deliberately mischaracterized these payments as "legal fees" in order to reduce the C-Corp.'s taxable profit. PSR ¶ 18.

Second, Nardozzi and Joyce declared these purported legal fees as self-employed business income in Schedule C of his personal tax returns as opposed to corporate dividends. By doing so, Nardozzi and Joyce fraudulently qualified Joyce to contribute to, and deduct contributions from, a Simplified Employee Pension Individual Retirement Arrangement ("SEP-IRA") that would not otherwise have been available to him had Nardozzi and Joyce correctly reported the income as corporate dividends. PSR ¶ 19.

Third, Nardozzi and Joyce falsely allocated $390,000 of Joyce's income to Mary Joyce, during the period from 2011 to 2014, so that she could inflate tax-deductible contributions each year to an SEP-IRA in her name, even though Mary Joyce performed no work for the C-Corp. during this period. PSR ¶ 20.

Fourth, between August and December 2014, Joyce borrowed approximately $76,000 in home equity loans and liquidated approximately $400,000, from his and his spouse's retirement

accounts to purchase private, non-publicly traded, stock in Energi, Inc. ("Energi"), a company that was paying Joyce's C-Corp. monthly for ostensible legal services. Nardozzi and Joyce falsely reported this stock purchase as a non-taxable IRA rollover on Joyce's 2014 joint personal income tax return. By falsely reporting the stock purchase as a retirement account rollover, Nardozzi aided Joyce in avoiding paying a significant tax and penalty fee. PSR ¶ 21.

Finally, Nardozzi and Joyce defrauded the IRS by intentionally mischaracterizing and omitting transactions that related to a $400,000 "loan" that Joyce had previously paid to himself from the C-Corp. Specifically, Nardozzi and Joyce took a false deduction of approximately $56,000 on Joyce's 2014 corporate income tax return, and omitted a $100,000 corporate dividend payment on Joyce's 2014 personal income tax return with respect to the earlier $400,000 "loan." PSR ¶ 22.

Sentencing Enhancements

As part of the deliberations, the Court instructed the jury that, in the event it found Nardozzi guilty of any count of the Indictment, it was required to find, beyond a reasonable doubt, whether or not Nardozzi (i) used a special skill in committing the offense and/or (ii) caused certain thresholds of monetary loss to the IRS, including above $550,000. The jury found in the affirmative for both. PSR ¶ 23.

The evidentiary record provided ample support for the jury's findings. Evidence adduced at trial showed that Nardozzi was a licensed CPA, a former partner at an established accounting firm, a licensed tax preparer who had prepared taxes for individuals and businesses for over thirty years, and an accountant who was well-versed with the Internal Revenue Code and had prepared Joyce's and the C-Corp.'s federal tax returns since the C-Corp.'s inception in 2006. The hundreds

of exhibits that were admitted at trial, including dozens of emails and spreadsheets that the defendant personally prepared or reviewed, exposed the defendant for what he was – a sophisticated professional, who used his specialized skill and experience in mischaracterizing and manipulating millions of dollars of C-Corp. income to fraudulently evade taxes for his VIP client. PSR ¶ 24.

Finally, the jury verdict on loss amount was tantamount to an unequivocal endorsement of the testimony of IRS Revenue Agent James McCurdy and a wholesale rejection of the defense theory of the case. That is, Nardozzi's diversion of millions of dollars of C-Corp. income to pay Joyce and his spouse "Schedule C income" from 2011 to 2014 was a complete sham that caused over $550,000 in loss to the IRS.

III.        18 U.S.C. § 3553 Factors

A 41-month sentence is appropriate in this case. The gravity of the offense cannot be understated. Nardozzi, through a years' long conspiracy with his accomplice, defrauded the government out of hundreds of thousands of dollars in federal taxes. Instead of having his client share the burden that every tax-paying citizen bears, Nardozzi duped the IRS for years in exchange for collecting tens of thousands of dollars in tax preparation fees. Indeed, it is likely that Nardozzi and Joyce's greedy tax scheme would have continued to the present day had Joyce's corrupt political activities not come to light in 2015.

A 41-month sentence is also appropriate for this defendant. The defendant was a former tax partner at a reputable accounting firm, the holder of Bentley graduate degree in taxation, a licensed CPA, a certified valuation expert, and the owner of a successful tax and business consulting firm. In other words, this defendant was afforded every opportunity to lead a

8

prosperous, law-abiding life.  Instead, the defendant used his special skill, talent and knowledge to lie, cheat, and steal.

A significant prison sentence in this case would also promote respect for the law, serve as adequate deterrence, and avoid sentencing disparity.  The United States Sentencing Commission's ("USSC") publicly available sentencing report for Massachusetts for Fiscal Year 2018 is attached as Exhibit A ("2018 MA Report").  The 2018 MA Report shows that nationwide, approximately 60% of federal tax offenders were sentenced to prison, receiving an average sentence of 17 months, *see* 2018 MA Report, T. 4, T. 7.

In Massachusetts, 14 of 21, or 66% of tax offenders were sentenced to prison during the same period, receiving an average sentence of 15 months in jail.  *See* 2018 MA Report, T. 5, T. 7.  Of those 21 tax defendants, 19 pleaded guilty before trial.  *See* 2018 MA Report, T. 3.  Moreover, in contemplating the average tax prison sentence in Massachusetts, it should be noted that the average sentence is likely lower than a within-Guidelines sentence because Massachusetts federal courts made downward departures and downward variances in 38.7% of all criminal cases in fiscal 2018.  *See* 2018 MA Report, T. 8.

The government believes that a sentence of 41 months' imprisonment plus restitution is thus sufficient but not greater than necessary to acknowledge the seriousness of the offense, justly punish the defendant, protect the public, and promote respect for the law.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Dustin Chao*
DUSTIN CHAO
EVAN GOTLOB
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, Dustin Chao, certify that I caused a copy of this memorandum to be served electronically via ECF on defense counsel and by e-mail to U.S. Probation.


*/s/ Dustin Chao*
DUSTIN CHAO
Assistant U.S. Attorney


Date:   January 3, 2020